IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MONTGOMERY CARL AKERS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 3:23-CV-2505-MAB |
| | ) |
| STEVE LAURITSEN, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Petitioner Montgomery Carl Akers brought this habeas corpus action pursuant to 28 U.S.C. § 2241 to challenge prison disciplinary proceedings, in which he was found guilty of using the mail for an illegal purpose and sanctioned with the revocation of 41 days of good time credit, amongst other things (Doc. 1). For the reasons explained below, Akers' § 2241 petition is denied.

### BACKGROUND

Petitioner Montgomery Carl Akers is an inveterate con man. As the Tenth Circuit recounted, he "has a long history of fraudulent activity," with convictions dating back to the late 1970s for crimes like, escape, forgery, possession of forged instruments or counterfeit securities, and fraud. *United States v. Akers*, 261 F. App'x 110, 116 (10th Cir. 2008); *see also United States v. Akers*, 215 F.3d 1089, 1105 (10th Cir. 2000) (recounting Akers "egregious" and "exceptional" criminal history).

At the time Akers filed the instant habeas case in 2023, he was serving a 327-month sentence imposed in 2006 for wire fraud. *See Akers*, 261 F. App'x at 114.[1] Shockingly, he committed the wire fraud *from his prison cell* while serving a 105-month sentence for bank fraud and other charges. *See Akers*, 215 F.3d at 1096.[2] Even more shocking, after he was indicted for wire fraud, Akers initiated another, similar fraudulent scheme with the help of a fellow inmate. *Id.* at 112. And after Akers pled guilty to the wire fraud and was awaiting sentencing, he initiated *two* more fraudulent schemes. *Id.* at 112–13.[3]

In his habeas petition, Akers is challenging prison disciplinary proceedings for attempting to pull off yet another scam. He raises the following purported problems with the proceedings that he claims amounted to a violation of his right to due process.

    1. The individual who issued him the Incident Report had no authority to do so;

---

[1] Akers was initially charged with five counts of wire fraud and later a charge for conspiracy to commit bank fraud was added. *Akers*, 261 F. App'x at 111, 112. Akers ultimately pled guilty in 2006 to just one count of wire fraud. *Id.* at 112. He was sentenced to 327 months' imprisonment, a "significant" upward variance from the otherwise applicable guideline range of 140 to 175 months, which the sentencing judge found justified by Aker's "egregious criminal record and . . . egregious history of continued criminal conduct during the pendency of [the] case." *Id.* at 115–16. The Tenth Circuit affirmed the upward variance, stating, "Akers has no regard for the rights of others. . . . The sentence imposed was ultimately and exquisitely reasonable—just desserts for one who has dedicated his life to victimizing others." *Id.* at 116.

[2] Akers was convicted by a jury in 1997 on 14 counts of bank fraud and one count of uttering and possessing a counterfeit security with intent to deceive. *Akers*, 215 F.3d at 1096. He was convicted that same year by a separate jury on one charge of failure to appear, which was brought after he absconded from the halfway house where he was on pretrial release. *Id.* at 1095, 1096. He was sentenced to 107 months' imprisonment, an upward variance from the guideline range based on his "egregious" and "exceptional" criminal history. *Akers*, 215 F.3d at 1104. The Tenth Circuit affirmed the upward variance, finding there was ample basis to support the district court's conclusion that Akers "had a proven commitment to criminal enterprise that made rehabilitation improbable and recidivism exceptionally likely." *Id.* at 1105–06.

[3] The district court judge who sentenced Akers in 2006 to 327 months' imprisonment was "appalled[,] disappointed and outraged" with the Department of Justice's failure to prevent Akers from continuing his criminal conduct while incarcerated, and accordingly recommended that (1) he be placed in segregated confinement, (2) he not be allowed to receive or send any mail except to his counsel of record, (3) all of his correspondence be scrutinized to ensure its legality and (4) he not have any telephone privileges. *Akers*, 261 F. App'x at 114 n.2.

2. The Incident Report includes "fabricated" accounts of his conduct;

3. The first Disciplinary Hearing Officer committed multiple procedural errors;

4. Case Manager Nathan Simpkins interfered with the witnesses' Akers wanted to call at the second hearing;

5. The second Disciplinary Hearing Officer did not follow policy in revoking Akers' good conduct credit;

6. The second Disciplinary Hearing Officer used fabricated evidence and colluded with Case Manager Simpkins to "railroad" Akers and find him guilty;

7. Akers was not given a timely written decision from the second Disciplinary Hearing Officer.

(Doc. 1, pp. 6, 7). Respondent filed a response in opposition to the habeas petition, supported by records from every stage of the disciplinary proceedings and select BOP policy statements (Doc. 37). Akers filed a reply brief (Doc. 40). Several days later, Akers sought leave to supplement his reply brief with additional argument and evidence (Doc. 41), which the Court denied (Doc. 43).

## FACTS

The Court recounts only those facts necessary to provide a coherent overview of the disciplinary proceedings and to give sufficient context for Akers' arguments.

On July 5, 2021, Akers had a telephone conversation with Ary, the general manager at Valley Pawn in Albuquerque, New Mexico, about how a person would hypothetically pawn a vehicle (Doc. 1, p. 6). (*See also* Doc. 37-3, p. 11 (transcript of phone call)). Later that same day, Akers wrote a follow-up letter to Ary (Doc. 37-3, pp. 7–10). In the letter, Akers stated that he is in Federal Prison for wire fraud but is being released

soon because he is "actually innocent" (*Id.* at p. 7). Akers indicated that he is liquidating possessions to pay his "attorney fees, professional fees, and court encumbrances," including "a motorhome being donated for these purposes by a benefactor of [his]" (*Id.*). Akers stated he has a choice of several motorhomes from Newell Coach Corporation, and he was working with attorney, Donald F. Kochersberger, III, and Mr. Kochersberger's assistant, Alex Ayala, to obtain a catalog from Newell Coach so that he could make a selection (*Id.* at pp. 7, 8, 9). Akers advised that once he made his choice, the motorhome would be transported to Kochersberger's office in Albuquerque, NM, and he would then take the motorhome to Valley Pawn to work out an "arrangement . . . beneficial to both of us" (*Id.* at pp. 8, 9). Akers recounted the portion of the phone conversation about Valley Pawn issuing a $2,000 loan while the motorhome remained "stored" at the pawn shop (*Id.* at p. 8). Akers asked if it was possible for him to commission Valley Pawn to sell the motorhome while it was being stored in lieu of repaying the loan (*Id.*).[4] Akers stated that his "aim [was] to provide [Kochersberger] with a cash flow to compensate his legal representations and ancillary support needs [Akers has]" (*Id.* at p. 9).

At the time of the phone call and letter, Akers was incarcerated at USP-Marion in the Communications Management Unit ("CMU") (Doc. 37-1, para. 5; *see* Doc. 37-3, p. 3). The CMU houses inmates whose communications to the outside world require heightened supervision or limitations in order to protect the public and ensure the safe,

---

[4] In other words, as the Court understands it, Valley Pawn would make a $2,000 loan now and hold the motorhome as collateral (*see* Doc. 37-3, p. 8). Then, during the term of the loan, Valley Pawn would work out a deal with Don to sell the motorhome and split the proceeds with him/Akers in some fashion (*see id.*).

secure, and orderly operation of prison facilities. *See* 28 C.F.R. § 540.200. *See also* 28 C.F.R. § 540.201 (enumerating criteria for assigning prisoners to CMU). BOP staff monitor and review the content of every letter, email, or phone call that a CMU prisoner sends or receives (with the exception of certain communications with the inmate's attorney). *See Id.* at §§ 540.203, 540.204.

Akers' letter to Ary was reviewed by BOP employee Jamie Conover on July 6, 2021 (*see* Doc. 37-3, p. 3). Conover determined that Akers was attempting to perpetrate a fraud upon Valley Pawn and issued Akers an Incident Report for "Use of Mail for Illegal Purposes" (Doc. 37-3, pp. 3–5). Conover also stated unequivocally that Akers "does not have a benefactor," as evidenced by the lack of any communications suggesting Akers "has a benefactor" or "advis[ing] [that] he will receive gifts of any kind from anyone" (*Id.*). Conover also noted that Akers had been continuously incarcerated in the BOP since 1997 and "ha[d] no financial assets which would facilitate him being able to select a motorhome from Newell Coach Corporation" (*Id.* at pp. 3, 4). Conover thus concluded Akers had "created a fictitious and fraudulent story" in an attempt "to convince Valley Pawn that he has this asset"—meaning a motorhome—"so that he in turn would receive $2,000 from Valley Pawn in order to pay Don [Kochersberger] attorney fees" (*Id.* at p. 4).

The Incident Report was sent to the Unit Disciplinary Committee ("UDC") for review (*see* Doc. 37-3, p. 4; *see also* Doc. 37-11, p. 25). Akers submitted a six-page handwritten statement to the UDC defending himself against the charge (Doc. 37-3, p. 3; *see also id.* at pp. 12–17 (Akers' statement)). The UDC, via chairman Kathy Hill, opted to refer the matter to the Disciplinary Hearing Officer for further hearing and recommended

"max loss of privileges and good time" (Doc. 37-3, p. 3).

Disciplinary Hearing Officer Banuelos held the hearing on March 29, 2022 (Doc. 37-4, p. 2). Akers denied the charge against him, but DHO Banuelos concluded that Akers committed the violation of using the mail for illegal purposes when he corresponded with Valley Pawn "attempting to receive $2,000.00 from them in exchange for a fictitious motorhome [he] received from a benefactor that doesn't exist" (*Id.* at p. 5).

Akers appealed the DHO's decision to the Regional Office, which found that a procedural error had occurred in the disciplinary process (but did not specify the nature of that error), and returned the matter to USP-Marion to begin the disciplinary process anew (Doc. 37-1, para. 9; *see also* Doc. 37-5, pp. 2–4). The Incident Report was accordingly re-served on Akers, re-reinvestigated by a BOP staff member, and then re-reviewed by the Unit Disciplinary Committee (*see* Doc. 37-6). The UDC, via chairman Nathan Simpkins (who was also the case manager for the CMU), once again decided to refer the matter to the Disciplinary Hearing Officer for further hearing and recommended "max loss of privileges and good time" (*Id.* at p. 4; Doc. 37-1, para. 18).

The second DHO hearing was held on August 18, 2022, in front of Disciplinary Hearing Officer Evelyn Keller (Doc. 37-8, p. 2). Prior to the hearing, Akers advised that he wanted Mrs. Wallace to serve as his staff representative at the hearing, and he wanted to call witnesses Tracy Allen, who was his supposed "benefactor," and Don Kochersberger, his attorney Doc. 37-7, pp. 2–3; *see also* Doc. 37-3, pp. 16, 19). DHO Keller was unable to contact Tracy Allen because Akers never provided contact information for

her; Keller noted "[n]o evidence of a Tracy Allen exists" (Doc. 37-8, pp. 3, 5; *see also* Doc. 37-1, para. 13).

As for Kochersberger, DHO Keller tried to contact him, but he did not return the call (Doc. 37-8, pp. 3, 5; *see also* Doc. 37-1, para. 13). DHO Keller stated in her report, however, that Akers' staff representative Ms. Wallace and Case Manager Simpkins "reached out to the attorney on [Aker's] behalf" (Doc. 37-8, pp. 3–5). DHO Keller explained in an affidavit that Ms. Wallace wanted to contact the attorney because Akers had listed him as a witness, but Ms. Wallace was unsure how to get ahold of the attorney, so she contacted Simpkins, who helped her call the attorney (Doc. 37-1, para. 18). The call was seemingly quite brief. Kochersberger confirmed that he had authored an email that Akers received on November 10, 2021, and "this was still his stance" (Doc. 37-8, p. 5). Kochersberger declined to provide any further comment (*Id.*).

That November 10, 2021, email was part of the record (Doc. 37-10, p. 42). It shows that Akers emailed Kochersberger asking him to contact a man named Chris Peeler "who buys and sells motorhomes" (*see id.*). Akers told Kochersberger that the motorhome was a "2020 Newell Coach #1677 (Merelli)" that had a sales price of $1,895,000, and "the motorhome paperwork [was] somewhere in [Kochersberger's] office" (*Id.*). Akers asked Kochersberger to call Peeler and "put a deal together," and to let him know if Peeler "agrees to the 1.7 million price" (*Id.*). Kochersberger responded, telling Akers that "this whole project . . . has turned into a giant time-suck" (*Id.*). He criticized Akers for not following through on things they had discussed, which left him "entirely in the dark about the provenance of this purported motorhome you plan to sell" (*Id.*). Kochersberger

Page 7 of 18

went on to tell Akers that "none of your schemes make any sense to me and, while you will always have an explanation, I am not comfortable participating in moving them forward any longer." (*Id.*). Kochersberger stated "we are terminating the attorney-client engagement with you at this time." (*Id.*).

Akers also asked the DHO to contact Chris Peeler, who was the owner of the dealership where the motorhome was allegedly located (Doc. 37-1, para. 13). The DHO did so, and Peeler stated that he did not remember anything and did not "want to be involved in this" (*Id.*; Doc. 37-8, pp. 3, 5).

At the hearing, Akers was given the opportunity to present his testimony and any other evidence he wished to provide (Doc. 37-1, para. 14; *see also* Doc. 37-8, pp. 2–3). Akers insisted that he did nothing wrong in speaking to Valley Pawn; he claimed he was just getting information from Valley Pawn for his attorney, and that all he did was ask questions (Doc. 37-8, p. 2). Akers also talked about the motorhome, stating "my friend passed away in 2021 [and] the motor home was donated to me because my friend knew I needed somewhere to live when I got out of prison" (*Id.* at p. 3). According to Akers, his friend's wife contacted the attorney, and the attorney in turn contacted him to tell him that the motorhome had been left to him and to "provide a pathway for me to finalize the sale of the motorhome" (*Id.*).

DHO Keller considered all of the evidence in the record: Akers' testimony, the Incident Report and Conover's statement, Akers' written statement to the UDC, the letter to Valley Pawn, the previous DHO report, and the witness statements, including the email from Kochersberger (Doc. 37-1, para. 14, 15; *see also* Doc. 37-8). Doc. 37-8, p. 6). She

noted that Akers had been asked numerous direct questions about the motorhome and the benefactor that he could not answer; all he offered was statements that he "[was] working with the attorney" (*Id.*). The DHO further noted that Akers had changed his story about the purpose of the motorhome—he told her it was left to him so that he had a place to live but he previously told the pawn shop it was to help him pay his bills (*Id.*). The DHO also found it "highly unlikely" that things had gone the way Akers claimed— that the benefactor contacted an attorney who then contacted Akers about the motorhome—given that Akers could not provide contact info for the benefactor and the attorney had written an email saying that Akers' motorhome "scheme" did not make any sense to him and he was no longer willing to participate in moving it forward (*Id.*). The DHO further noted that "to date" Akers had not provided any evidence that money was left to him from a benefactor to purchase a motorhome or that he owned a motorhome that he was legally entitled to sell (*Id.*).

DHO Keller concluded that Akers had committed the prohibited act and sanctioned him with the loss of 41 days of Good Conduct Time and loss of phone privileges for 120 days (Doc. 37-1, para. 16; Doc. 37-8, pp. 6, 7). DHO Keller stated in her affidavit that Akers was informed of her decision and the sanctions on the day of the hearing (Doc. 37-1, para. 16). She completed her written report on October 3, 2022 and it was delivered to Akers two days later (Doc. 37-8, p. 7). Akers appealed to the Regional Office, (Doc. 37-10, pp. 3–4), but his appeal was denied (*Id.* at p. 2).

## DISCUSSION

The Court notes as an initial matter that Akers was released from prison during

the pendency of this case and is now on supervised release at a Residential Reentry Center (*see* Doc. 44). Respondent did not argue, nor does the Court believe, that Akers' release rendered his habeas petition moot. *See Lauderdale-El v. Indiana Parole Bd.,* 35 F.4th 572, 575 (7th Cir. 2022) (citing *White v. Indiana Parole Board,* 266 F.3d 759, 762–63 (7th Cir. 2001) (explaining that restoration of good time credits could lead to an earlier end to parole). Given that Akers could still potentially receive meaningful relief if he prevailed in this case, the Court opts to address the merits of the case and to ignore Akers' failure to keep the Court informed of his current address and his failure to respond to the Show Cause Order previously entered (Doc. 44).

Federal inmates may, after exhausting administrative remedies, challenge prison disciplinary proceedings that led to loss of good time credits by filing a habeas petition under 28 U.S.C. § 2241. *Jackson v. Carlson*, 707 F.2d 943, 946 (7th Cir. 1983). Prisoners have a liberty interest in good-time credits, and officials may not revoke them without due process. *Jones v. Cross*, 637 F.3d 841, 845 (7th Cir. 2011). Due process, in the context of a prison disciplinary hearing affecting the length of the prisoner's sentence—like a reduction in good-time credit—requires that the prisoner receive (1) written notice of the claimed violation at least 24 hours before hearing; (2) the opportunity to be heard by an impartial decisionmaker; (3) the opportunity to call witnesses and present documentary evidence at the hearing, if prison safety allows; and (4) a written statement by the decisionmaker of the evidence relied on and the reasons for the disciplinary action. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Wolff v. McDonnell,* 418 U.S. 539 (1974)). In addition to these procedural safeguards, the disciplinary decision must also

"be supported by at least 'some evidence.'" *Scruggs*, 485 F.3d at 941 (quoting *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985)).

Akers' first argument is that Jamie Conover had no authority to write and issue the Incident Report (Doc. 1, p. 6; Doc. 40, p. 2; *see also* Doc. 37-3, p. 12). According to Akers, Conover "claim[s]" to be an analyst with the Counter Terrorism Unit in West Virginia, but Akers has "never been under the auspice of the CTU" (Doc. 1, p. 6). Akers adds to this argument in his reply brief by claiming that BOP policy only permits staff members at the institution where the alleged conduct took place to write an Incident Report for that conduct (Doc. 40, p. 2). Akers also argued in his reply brief that Conover had no authority to issue the Incident Report because she was not an employee of the BOP but rather a "contract employee" (Doc. 40, p. 2).

Turning first to Akers' contention that an offsite employee could not issue him an Incident Report, Akers does not provide a copy of or citation for the BOP policy that he invokes (*see* Docs. 1, 40). Furthermore, the Federal Regulations contradict Akers' position. The Regulations provide that the discipline process starts with an Incident Report issued by "a staff member," and "staff" is defined to mean "any employee of the Bureau of Prisons or Federal Prison Industries, Inc." 28 C.F.R. §§ 500.1(b), 541.5(a). In other words, any employee of the BOP can issue an Incident Report to an inmate, not just the employees at the facility where the inmate's conduct occurred.

The Court is likewise unpersuaded by Akers' argument that he is not subject to the authority of the Counter Terrorism Unit. This argument seems to reflect nothing more than Akers' confusion about terminology and titles used by the BOP and/or the

organizational structure and division of labor that it employs. The Court sees nothing inherently problematic, let alone unconstitutional, with having CMU inmates' correspondence reviewed by analysts assigned to the Counter Terrorism Unit and located offsite. Finally, Akers does not provide any evidence to support his contention that Conover is not a BOP employee (*see* Docs. 1, 40). Even if the Court assumed Akers was correct, he does not explain how/why having an independent contractor issue an Incident Report possibly infringes on his due process rights (*see* Docs. 1, 40). Accordingly, this argument must fail.[5]

Akers' second argument is that, in the Incident Report, Conover "fabricated accounts" of his phone call and letter to Ary at Valley Pawn as "criminal activity" (Doc. 1, p. 6). A review of the record, however, demonstrates that is simply not true. Conover did not make up anything; rather, she summarized the letter quite accurately in the Incident Report (*compare* Doc. 37-3, pp. 3–5 (Incident Report) *with id.* at pp. 7–10 (letter)). In fact, most of the time, she repeated what was said in the letter verbatim. With respect to the phone call, Conover never summarized it in the Incident Report; she simply

---

[5] The Court also notes that the record shows DHO Keller advised Akers during the second DHO hearing that Conover *is* a BOP staff member (Doc. 37-8, p. 5), and Keller's affidavit likewise refers to Conover as a "BOP staff (Doc. 37-1, para. 7). Neither of these are admissible evidence, however; the first is hearsay and the second lacks foundation in that Keller does not establish she has personal knowledge of Conover's employment status (*see id.*). While respondent could have disposed of Akers' argument by submitting an affidavit from Conover attesting that she is a BOP employee, the Court does not believe Respondent should be required to counter and disprove every single one of Akers' frivolous contentions, particularly when Conover has already provided a sworn statement regarding her employment in another case in which Akers sued her. *See Akers v. Conover,* D. Mont. Case No. 2:20-cv-64-BMM-JTJ, Doc. 22-1, para. 3 (affidavit from Jamie Conover dated April 28, 2021, attesting that she is employed as a Bureau of Prisons Intelligence Analyst and stationed at the Federal Bureau of Prisons Counter Terrorism Unit in Martinsburg, West Virginia, and has held that position since 2019).

attached a transcript of the call (*see* Doc. 37-3, pp. 3–5; *see also id.* at p. 11).[6]

It seems as though Akers intended to argue that Conover mischaracterized or misinterpreted his phone call and letter as criminal activity. But that in and of itself does not amount to a due process violation so long as Akers was afforded the necessary procedural safeguards set forth in *Wolff v. McDonnell* . *Lagerstrom v. Kingston*, 463 F.3d 621, 623, 624–25 (7th Cir. 2006) (affirming holding that falsified ticket does not violate due process so long as inmate is afforded necessary procedural safeguards during disciplinary proceedings; "the process itself is a constitutionally adequate safeguard against the arbitrary actions of prison officials."); *McPherson v. McBride*, 188 F.3d 784, 787 (7th Cir. 1999) ("[W]e have long held that as long as procedural protections are constitutionally adequate, we will not overturn a disciplinary decision solely because evidence indicates the claim was fraudulent") (citations omitted). Here, it is indisputable that Akers received written notice of the charge against him well in advance of the disciplinary hearing in front of DHO Keller. And Akers makes no argument that DHO Keller was not an impartial decisionmaker (*see* Docs. 1, 40). While Akers raises challenges to his ability to call witnesses, his receipt of a written decision, and the sufficiency of the evidence, the Court finds these challenges are without merit, as further explained below.

Aker's third argument revolves around procedural shortcomings in the first DHO

---

[6] Conover refers to the transcript as "notes from Trufone" (Doc. 37-3, p. 5). TRUFONE is the inmate telephone system used by the BOP for inmates to place phone calls (*see* Doc. 37-12, p. 57). All calls processed through TRUFONE are recorded (*Id.*). It appears to the Court that TRUFONE not only records the calls but is also capable of transcribing them (*see* Doc. 37-3, p. 3, 11). There is nothing in the record that suggests Conover played any part in creating the transcript of the phone call.

hearing before DHO Banuelos (Doc. 1, p. 6). This argument is moot, however, because the Regional Office overturned Banuelos's decision, thereby rectifying any due process violation or other constitutional defect. *Lagerstrom*, 463 F.3d at 623, 624–25; *McPherson*, 188 F.3d at 787.

Akers next argues that his case manager, Nathan Simpkins, interfered with the disciplinary process by contacting "several" of his intended witnesses to disparage him and make it seem like he was committing a crime against those witnesses (Doc. 1, p. 6). Specifically, Akers claims that Simpkins "bamboozled" his attorney, Mr. Kochersberger, "into breaching attorne[y] client privilege and discussing [Akers'] private business matters" (Doc. 1, p. 7). Akers claims that Simpkins "also did this" with another witness named Chris Peeler of Texas (*Id.*). According to Akers, once he asked for a staff representative, Simpkins could "have no further interactions on this matter" (*Id.*).

Akers did not, however, submit any evidence to support his contention that Simpkins essentially tampered with his witnesses or inappropriately usurped the role of his staff representative. Starting with Chris Peeler, there is absolutely no evidence that Simpkins ever spoke to Peeler, much less somehow tricked him. As for Kochersberger, the record indicates that Simpkins simply helped Akers' staff representative, Mrs. Wallace, place the call to Kochersberger. There is nothing that indicates Simpkins actually spoke to Kochersberger, let alone disparaged Akers. Additionally, Akers does not specify what privileged information he supposedly thinks Simpkins obtained from Kochersberger, and there is no indication in the record that any such information was

divulged.[7] Even if the Court were to assume that Simkins *did* speak with Kochersberger, the Court fails to see how it possibly harmed Akers. Akers does not argue that he expected Kochersberger to give a statement in support of him (*see* Docs. 1, 40). Nor does the Court think that was a reasonable possibility when Kochersberger had fired Akers as a client some nine months prior because, Kochersberger still had no idea where the supposed motorhome came from or how Akers came to acquire it, and Kochersberger was no longer willing to play any part in what he called a nonsensical "scheme" (Doc. 37-10, p. 42).

Akers next argues that DHO Keller did not follow BOP policy in revoking his good time credit (Doc. 1, pp. 6–7). Specifically, he claims that Keller said he was "to be treated differently there in the CMU Unit" and "claimed [he] had over [one] year to prove to the prisons that [he] owned a motorhome in question" (*Id.*). The Court is not quite sure the point Akers is trying to make here. He did not explain *who* he was treated differently from, *how* he was supposedly treated differently, or *why* it amounted to a reversible due process violation. Akers' argument is simply too undeveloped to establish his entitlement to relief or for the Court to meaningfully address it. *See Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) (court is "not responsible for constructing the parties' arguments" and where "a party fails to develop the factual basis of a claim . . . and, instead, merely draws and relies upon bare conclusions, the argument is deemed

---

[7] To the extent that Akers is referring to the emails between he and Kochersberger that were part of the disciplinary record, his argument is meritless. It was Akers who chose to contact his attorney over email, knowing full well that emails were not protected and were reviewed by staff (*see* Doc. 37-12, pp. 126, 127).

waived."); *Anderson v. Hardman*, 241 F.3d 544, 545–46 (7th Cir. 2001) (even a pro se brief must articulate a cogent argument).

Akers also argues that DHO Keller failed to follow BOP policy in revoking his good time credit because she knew Simpkins had no authority to contact his witnesses but did nothing to rectify the situation (Doc. 1, pp. 6–7). But as the Court already explained above, there is no proof that Simpkins actually spoke to Akers' witnesses or that they would have said anything favorable about Akers.

Akers next argues that DHO Keller "used fabricated information and colluded with case manager Simpki[ns] to railroad [him]" in the disciplinary proceedings (Doc. 1, p. 7). This conclusory statement fails to establish any right to relief. To the extent Akers is trying to argue that Keller's decision to find him guilty was not supported by the evidence, the Court disagrees. Akers wanted Keller to believe that, after being in prison for over 23 years, he had a "benefactor" that suddenly materialized and wanted to buy him an almost $2 million motorcoach, which he was then going to immediately turn around and sell in order to raise money to cover his expenses. It is a nonsensical and far-fetched story. And coming from a serial fraudster, it is almost certain to be complete fiction. BOP Keller dutifully discussed why the evidence before her led her to the same conclusion. She pointed out Akers' shifting story about the purpose of the motorhome. She pointed out Conover's representation that none of Akers' correspondence—every piece of which had been monitored since he was assigned to the CMU—ever mentioned a benefactor or any type of gift or bequest. She pointed out that Akers was never able to provide contact information for his supposed benefactor or documentary evidence that

he owned a motorhome, despite having over a year to do so. She pointed out that neither of his two witnesses who were contacted were willing to say anything in support of him. And, in fact, his former attorney (Kochersberger) had referred to the motorhome project as a "giant time suck" and a "scheme" that made no sense and which he was no longer willing to take part in. She also pointed to several commonsense reasons why Akers' story simply didn't add up. DHO Keller then very reasonably concluded there was no benefactor and Akers did not own a motorhome and, therefore, his correspondence with Valley Pawn attempting to sell, pawn, or receive a loan for a motorhome was for an illegal purpose. That was clearly enough to satisfy the "some evidence" standard and sustain the charge against Akers. *See Scruggs*, 485 F.3d at 941.

      Finally, Akers challenges the length of time it took for him to receive DHO Keller's decision (*see* Doc. 1, p. 7). BOP policy states that the DHO will give the inmate a written copy of the decision "ordinarily within 15 work days of the decision" (Doc. 37-11, p. 36; *see also* Doc. 37-1, para. 17). In this instance, it took somewhere around twice that long (*see* Doc. 37-1, para. 12, 17). But Akers failed to explain how the delay harmed him or somehow amounted to a due process violation (*see* Doc. 1). The delay does not strike the Court as unreasonable and there is no indication that it was prejudicial to Akers; he was informed of the DHO's decision and sanction on the day of the hearing and the delay did not extend his prison term or prevent him from appealing the DHO's decision (*see* Doc. 31-1, para. 16, 17). *See Deroo v. Holinka*, 373 F. App'x 617, 619 (7th Cir. 2010) (no prejudicial violation of due process where inmate was not provided written statement of reasons for disciplinary action because BOP eventually provided written reports years later, inmate

could appeal without the reports, and delay did not extend inmate's prison term).

For these reasons, Akers has not established any procedural shortcomings in the disciplinary proceedings and his petition for habeas relief under 28 U.S.C. § 2241 (Doc. 1) is therefore **DENIED**. This cause of action is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: March 4, 2026**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**